2000 OK CIV APP 80

In the Matter of the GUARDIANSHIP OF Ralph C. LOHSE, a partially incapacitated person.

Deborah Ann Goodman, Petitioner/Appellee,

v.

Fred Whisenand, Contestant/Appellant.

No. 93,683.

Court of Civil Appeals of Oklahoma, Division No. 3.

May 26, 2000.

Ernest F. Godlove, Godlove, Mayhall, Dzialo, Dutcher & Erwin, Lawton, Oklahoma, for Appellant.

John Munkacsy, Ashton, Wisener & Munkacsy, P.C., Lawton, Oklahoma, for Appellee.

JOPLIN, Judge:

¶ 1 Fred Whisenand (Contestant) seeks review of the trial court's order approving the Amended Guardianship Plan offered by Debra Goodman, (Goodman) guardian of the person of Ralph C. Lohse (Ward), for Ward's proposed care and maintenance, and denying Contestant's prayer for Goodman's removal as guardian. In this appeal, Contestant asserts the trial court erred as a matter of both fact and law in approving the proposed guardianship plan, and in failing to remove Goodman as Ward's guardian. Having reviewed the record, however, we find the order of the trial court unaffected by pure error of law or abuse of discretion. Accordingly, we hold the order of the trial court should be affirmed.

¶ 2 Ward was born and raised in Williston, North Dakota. He married but had no biological children. However, Ward gave some assistance to his nephew-by-marriage (Chandler) while Chandler was in highschool. Al-

though never formalized, Ward also "adopted" Goodman when she was eight, changed her surname to his own, and with his wife, represented Goodman as his daughter to others.[1]

¶ 3 Sometime after she attained majority, Goodman moved to Oklahoma and, in the early 1980s, married after her "adoptive" mother, Ward's spouse, died. At about the same time, Ward remarried and moved to California with his new spouse, but Goodman and Ward remained in contact, and Ward returned to Williston for visits approximately twice a year, maintaining a vacation apartment there. Sometime in the early 1990s, Ward consulted Contestant, who prepared Ward's Last Will and other documents placing Ward's rather considerable estate into a trust, and Ward appointed Contestant as his attorney in fact.

¶ 4 In 1997, Ward's second spouse suffered a stroke, and Ward granted Chandler a limited power of attorney to make decisions for Ward's healthcare. In 1998, Ward and his spouse returned to Williston, Ward's spouse apparently in need of full time hospitalization and/or nursing home care. During this same period, and with his mental health deteriorating, Ward, with Chandler's knowledge and consent, was moved to a nursing home in Williston.

¶ 5 Shortly thereafter, Goodman traveled to California to retrieve some of Ward's personal property, apparently at Ward's request. In December 1998, Goodman, with her husband and children, went to Williston, removed Ward from his nursing home, and returned to Oklahoma with Ward. Ward's second wife of 18 years died in early 1999.

¶ 6 Goodman subsequently applied for appointment as guardian of Ward's person. In March 1999, without objection by Ward, and upon Ward's nomination, the trial court appointed Goodman as guardian of Ward's per-

---

1. All parties agree that it was "common knowledge" that Goodman was the adopted daughter of Ward and his spouse. However, and although Ward held Goodman out as his daughter—even to his attorney-in-fact, Whisenand,—Ward never initiated any formal adoption proceeding, a fact unknown to any of the parties except Ward. In this respect, Goodman adduced evidence below tending to show that upon the death of Goodman's biological parents, Ward and his spouse assumed Goodman's care and custody, but did not initiate adoption proceedings in order to collect payments from Goodman's father's estate to which Goodman was entitled, but which would have ceased if formal adoption proceedings had been finalized.

son.[2] The trial court subsequently appointed an independent guardian of Ward's estate.

¶ 7 Goodman consequently submitted a proposed Plan and Amended Plan for the care and maintenance of Ward. Contestant objected to the proposed guardianship plan as "not adequately address[ing] the needs of the Ward[,] lacking in detail and request[ing] unreasonable compensation and reimbursement." Contestant also requested the removal of Goodman as guardian of the Ward's person, alleging Goodman's "defalcation of the funds that belong to the Ward," "misuse of [Ward's] funds," "unduly influencing" the Ward in the expenditure of his funds, and "other actions" allegedly intended to benefit Goodman and her family without a "corresponding benefit to the Ward or his estate."[3]

¶ 8 Upon consideration of the parties' evidence and argument, the trial court denied Contestant's challenge to the guardianship plan and request for Goodman's removal as Ward's guardian. Contestant now seeks review in this Court.

¶ 9 Contestant first challenges the trial court's judgment as contrary to law. Here, Contestant argues that Oklahoma statute, 63 O.S.1991 1–820, requires one providing a "residential care home" for "persons not related by blood or marriage to the owner ... of the home" to obtain licensure from the state. So, says Contestant, inasmuch as Goodman is not legally related to Ward by blood or marriage, and cares for Ward in her home, but has obtained no appropriate license for that purpose, Goodman's plan should have been rejected and Goodman removed as guardian.

¶ 10 As a matter of statutory construction, "[t]he primary goal of statutory construction is, of course, to ascertain and follow the intent of the Legislature." *Bruner v. Sobel*, 1998 OK 60, ¶ 9, 961 P.2d 815, 817. And,

"where the Legislature has clearly expressed its intent, the use of additional rules of construction are unnecessary and a statute will be applied as written." *Id.*

¶ 11 So guided, we find Contestant's reliance on § 1–820 misplaced. That definitional section contains the terms for application of the Oklahoma Residential Care Act, 63 O.S. 1991 1–819 et seq., to "any establishment or institution ... which offers or provides residential accommodations, food service, and supportive assistance to any of its residents or houses any residents requiring supportive assistance ..." The plain language of the statutory scheme, in our mind, clearly evinces our Legislature's intent to regulate only those businesses operated for the sole and exclusive purpose of providing room, board and other "supportive assistance" to the elderly or infirm for remuneration.[4] In this respect, we discern no suggestion of legislative intent to regulate the provision of intra-familial care to elderly or infirm family members, particularly where the more expensive emotional and financial costs of institutionalized geriatric care are avoided.

¶ 12 In this same vein, Contestant nevertheless challenges the guardianship plan for further violation of the Oklahoma Adult Day Care Act, 63 O.S. Supp.1998 1–870, et seq. Here, Contestant points out that Goodman's guardianship plan proposed care of Ward several days a week by a neighbor in the neighbor's home while Goodman attended to other family matters. However, says Contestant, § 1–872 of the Adult Day Care Act requires licensing of any "facility which provides basic day care services to unrelated impaired adults for more than four (4) hours" per day. Thus, concludes Contestant, inasmuch as the Ward is not related to the neighbor, and the neighbor, although providing "basic day care services," has obtained no license for that purpose, Goodman's plan

---

**2.** Indeed, Contestant, the trustee of Ward's trust, and Goodman all agreed Ward should remain in Goodman's custody with the issue of appointment of a guardian of Ward's estate to be later determined.

**3.** The initial challenge was filed by Donald Arnson, apparently related by marriage to Ward's second wife. Thereafter, Contestant entered his appearance, adopting the filings and arguments

of Arnson. It appears from the record that Arnson was subsequently not active in the case.

**4.** As an example, 63 O.S.1991 1–820 (16) presumes that the owner of such a facility is "the person or entity that stands to *profit or lose* as a result of the *financial* success or failure of the operation." (Emphasis added).

should have been rejected and Goodman removed as guardian.

¶ 13 However, and as before, we construe the plain language of the Oklahoma Adult Day Care Act as imposing no requirement for licensure of intra-familial care-givers to elderly or infirm family members. As Contestant would construe the statutes, the fact that Goodman was not formally adopted is immaterial, for under Contestant's construction neither an adopted child, a foster child, nor anyone else otherwise unrelated by blood or marriage, but in a familial relationship with an elderly or infirm adult, could ever attend to the aged family member's needs without licensure, a result surely not within legislative contemplation.

¶ 14 Contestant's remaining attacks, without citation of authority, merely outline Contestant's view of the evidence. Contestant complains the record amply shows inadequacy of Goodman's home to accommodate Ward's needs; Goodman's inability to provide a nourishing diet responsive to Ward's tastes; Goodman's inappropriate and undue influence and control of Ward's expenditures; and Goodman's insufficient training and assistance to attend to Ward's medical needs. However, the record also bears out Goodman's investment of considerable effort, time and expense—without meaningful assistance from Ward's trust[5]—to ensure that Ward did not spend his remaining years institutionalized and bed-ridden in the throws of age-related dementia, including Ward in numerous activities such as Ward's grandchildren's sporting events, farming, local festivals and events, church activities, birthday celebrations and other outings, while also taking care of Ward's physical needs. Indeed, the trial court and most witnesses, including Ward's independent court-appointed attorney, noted Ward appeared clean, well-dressed, well-fed, and *happy*.

¶ 15 In reviewing this case, this Court presumes the trial court's decision to be correct and will not disturb that decision unless clearly contrary to the weight of the evidence. *Matter of Estate of Eversole*, 1994 OK 114, ¶ 7, 885 P.2d 657, 661. In the present case, Goodman properly filed and presented her Amended Plan for Ward's care pursuant to 30 O.S.1991 3–120 (B), and explained in detail expenditures past, present, and future, as well as plans for the on-going care of Ward. The trial court, unlike this Court, observed first-hand the demeanor of the witnesses and parties, including Ward, and considered the evidence presented sufficient to warrant denial of both Contestant's objection to the guardianship plan and Contestant's prayer for removal of Goodman as guardian. Having independently reviewed the record, we find the trial court's judgment unaffected by legal error or abuse of discretion, and not clearly against the weight of the evidence.

¶ 16 The orders of the trial court should be and are therefore AFFIRMED.

¶ 17 HANSEN, V.C.J., and ADAMS, J., concur.

---

5. Although Goodman did use some of Ward's personal funds to facilitate the move from both California and North Dakota which the trustee and Contestant refused to pay, the trial court adjusted the finances after hearing allowing Goodman to retain some of the funds as reimbursement and ordering Goodman to repay the trust the excess.